1

2

3

4

5                       UNITED STATES DISTRICT COURT

6                            DISTRICT OF NEVADA

7                                         * * *

| | | |
|---|---|---|
| 8  IN RE: WESTERN STATES<br>WHOLESALE NATURAL GAS | ) | 2:03-CV-1431-PMP-PAL<br>BASE FILE |
| 9  ANTITRUST LITIGATION,<br>_____ | )<br>)<br>) | |
| 10 | ) | |
| 11 Learjet, et al. v. ONEOK, Inc., et al., | )<br>) | 2:06-CV-00233-PMP-PAL |
| 12 Heartland Regional Medical Center, et al. | )<br>) | 2:07-CV-00987-PMP-PAL |
| 13 v. ONEOK, Inc., et al., | ) | |
| 14 Breckenridge Brewery of Colorado, LLC, | )<br>) | 2:06-CV-01351-PMP-PAL |
| 15 et al. v. ONEOK, Inc., et al., | ) | |
| 16 Reorganized FLI, Inc. v. Williams<br>Companies Inc., et al., | )<br>) | 2:05-CV-01331-PMP-PAL |
| 17 Arandell Corp., et al. v. Xcel Energy, Inc., | )<br>) | 2:07-CV-01019-PMP-PAL |
| 18 et al., | ) | |
| 19 Arandell Corp., et al. v. CMS Energy<br>Corp., et al., | )<br>) | 2:09-CV-01103-PMP-PAL |
| 20 NewPage Wisconsin System, Inc. v. CMS<br>Energy Resource Management Co., et al., | )<br>) | 2:09-CV-00915-PMP-PAL |
| 21 | ) | |
| 22 Sinclair Oil Corporation v. e-Prime, Inc.<br>and Xcel Energy Inc., | )<br>) | 2:06-CV-00267-PMP-PAL |
| 23 Multiut Corporation v. Dynegy, Inc., et al., | ) | 2:05-CV-01300-PMP-PAL |
| 24 Sinclair Oil Corporation v. OneOK Energy<br>Services Company, L.P. | )<br>) | 2:05-CV-01396-PMP-PAL |
| 25 | )<br>) | **ORDER Re: Doc. #1880, #1884,<br>#1891, & #1944** |
| 26 | )<br>)<br>_____ | |

Presently before the Court is Defendants' Joint Renewed Motion and Motion for Summary Judgment (Doc. #1880), filed on December 16, 2009.  Plaintiffs filed a Joint Opposition (Doc. #1900) on February 1, 2010.  The Wisconsin Plaintiffs also filed an Opposition (Doc. #1904) on February 1, 2010.  Defendants filed a Reply (Doc. #1910) on February 26, 2010.  Plaintiffs filed a Surreply (Doc. #1924-1) on March 12, 2010.  Defendants filed a Notice of Supplemental Authority (Doc. #1961) on December 3, 2010.  Plaintiffs filed a Response (Doc. #1962) on January 7, 2011.  Defendants filed a Reply (Doc. #1964) on February 1, 2011.

Also before the Court is the ePrime Defendants' Notice of Motion and Motion for Partial Summary Judgment Based on Preemption (Doc. #1884), filed on December 16, 2009.  Plaintiff Sinclair Oil Corporation filed an Opposition (Doc. #1896) on February 1, 2010.  The ePrime Defendants filed a Reply (Doc. #1916) and request for judicial notice (Doc. #1917) on February 26, 2010.  Plaintiffs filed an Opposition (Doc. #1925) to the request for judicial notice on March 15, 2010.  The ePrime Defendants filed a Reply (Doc. #1932) on March 24, 2010.

Also before the Court is Dynegy Inc. and Dynegy Marketing and Trade's Motion for Partial Summary Judgment (Doc. #1891), filed on January 14, 2010.  Plaintiff Multiut Corporation filed an Opposition (Doc. #1919) on March 1, 2010.  Defendants Dynegy Inc. and Dynegy Marketing and Trade filed a Reply (Doc. #1934) on April 2, 2010.

Also before the Court is ONEOK Energy Services Company's Motion for Partial Summary Judgment (Doc. #1944), filed on May 26, 2010.  Plaintiff Sinclair Oil Corporation filed an Opposition (Doc. #1950) on June 10, 2010.  Defendant ONEOK Energy Services Company filed a Reply (Doc. #1951) on June 28, 2010.

I.      BACKGROUND

This Multi District Litigation ("MDL") arises out of the energy crisis of 2000-2001.  During that time, the national energy and natural gas markets became mutually

1  dysfunctional, and, feeding off each other spiraled into a nationwide energy crisis.

2  Amendments to Blanket Sales Certificates, 105 F.E.R.C. ¶ 61,217, at ¶ 12 (2003).  The

3  Federal Energy Regulatory Commission ("FERC") undertook a fact finding investigation of

4  the market crisis in which it concluded that "spot gas prices rose to extraordinary levels,

5  facilitating the unprecedented price increase in the electricity market."  Id.  FERC found the

6  dysfunctions in the natural gas market stemmed from efforts to manipulate price indices

7  compiled by private trade publications, including reporting of false data and wash trading.[1]

8  Id.

9        Plaintiffs seek to recover damages on behalf of natural gas purchasers, alleging

10  Defendants engaged in anti-competitive activities with the intent to manipulate and

11  artificially increase the price of natural gas for consumers.  Specifically, Plaintiffs allege

12  Defendants conspired to knowingly deliver false reports concerning trade information to

13  price indices and engaged in wash trades.  In some of these cases, Plaintiffs bring only state

14  law claims.[2]  In others, Plaintiffs bring both state and federal claims.[3]

15        Defendants previously moved to dismiss Plaintiffs' Complaints in J.P. Morgan

16  Trust Company, N.A. v. Williams Companies, Inc.[4] and Learjet v. ONEOK, Inc., arguing

17  the Natural Gas Act ("NGA") preempted Plaintiffs' state law claims under the doctrines of

---

[1]  A "wash trade" is a prearranged offsetting trade of the same product between the same parties, which involves no net change in ownership and no economic risk.  Such trades create a false price for use in indices.  Amendments to Blanket Sales Certificate, 105 F.E.R.C. ¶ 61,217, ¶ 38, ¶ 53.

[2]  Learjet, et al. v. ONEOK, Inc., et al., Heartland Regional Medical Center, et al. v. ONEOK, Inc., et al., Breckenridge Brewery of Colorado, LLC, et al. v. ONEOK, Inc., et al., Reorganized FLI, Inc. v. Williams Companies Inc., et al., Arandell Corp., et al. v. Xcel Energy, Inc., et al., Arandell Corp., et al. v. CMS Energy Corp., et al., and NewPage Wisconsin System, Inc. v. CMS Energy Resource Management Co., et al.

[3]  Sinclair Oil Corporation v. e-Prime, Inc. and Excel Energy Inc., Multiut Corporation v. Dynegy, Inc., et al., and Sinclair Oil Corporation v. OneOK Energy Services Company, L.P.

[4]  The plaintiff in this action since has been re-designated as Reorganized FLI, Inc.

3

field and conflict preemption.  In separate Orders, the Court suggested FERC's exclusive

jurisdiction over the transportation of natural gas in interstate commerce, the sale of natural

gas in interstate commerce for resale, and the natural gas companies engaged in such

transportation or sales, may preempt Plaintiffs' state law claims.  (Order (Doc. #448) at 6-

16; Order (Doc. #547) at 6-11.)  In J.P. Morgan, the Court dismissed Plaintiffs' claims as

preempted understanding that Plaintiffs conceded Defendants participated in the interstate

natural gas market and FERC therefore had exclusive jurisdiction over Defendants' alleged

misconduct in the wholesale natural gas market.  (Order (Doc. #448) at 15-16.)  The Court

later reconsidered this ruling based on Plaintiffs' clarification that in fact they did not

concede the factual question of Defendants' participation in the interstate market during the

relevant time period.  (Order (Doc. #548) at 4-9.)  In Learjet, the Court ruled that FERC's

exclusive jurisdiction may preempt Plaintiffs' claims but it was not clear from the face of

the Amended Complaint that Defendants engaged in jurisdictional sales during the relevant

time period, and, on a motion to dismiss, the Court had to construe the Amended Complaint

in Plaintiffs' favor.  (Order (Doc. #547) at 12-25.)

        Defendants thereafter moved for summary judgment, contending Plaintiffs'

claims against them are federally preempted under the doctrines of field and conflict

preemption.  Defendants relied on the Court's previous Orders indicating federal

preemption would bar Plaintiffs' claims if Defendants were jurisdictional sellers, i.e.,

natural gas companies engaged in sales for resale within FERC's jurisdiction.  Defendants

proffered evidence they engaged in jurisdictional sales during the relevant time period

identified in the Complaints.  Defendants therefore argued they were entitled to summary

judgment because they were natural gas companies subject to FERC's exclusive jurisdiction

during the relevant time period, and consequently, Plaintiffs' claims are preempted.

Plaintiffs responded that based on decisions from the United States Court of Appeals for the

Ninth Circuit following the Court's prior Order, the Court was required to take a

transactional view to determine whether Plaintiffs' claims involved conduct falling within FERC's jurisdiction.

In ruling on Defendants' motion for summary judgment, this Court held that "[i]f either the injury-causing transaction or the alleged market manipulation occurred within FERC's jurisdiction, Plaintiffs' claims would be preempted." (Order (Doc. #1025) at 14.) However, where FERC does not have jurisdiction over either the injury-causing sale or the manipulative conduct, FERC lacks jurisdiction and therefore cannot preempt state law. (Id.) The Court also noted that "[m]any entities engage in both jurisdictional and non-jurisdictional sales. That FERC has jurisdiction over entities engaged in jurisdictional sales does not mean FERC has exclusive jurisdiction over those companies' conduct in non-jurisdictional transactions." (Id. at 16.)

Finally, the Court held that viewing the facts in the light most favorable to Plaintiffs, "it is possible that Plaintiffs may be able to prove Defendants conspired to control natural gas rates and engaged in manipulative conduct in non-jurisdictional transactions, including wash trades and false reporting of retail and first sale rates to price reporting indices" and that Plaintiffs purchased natural gas at the artificial rates in non-jurisdictional transactions. (Id. at 17.) "In such circumstances, FERC would have no jurisdiction over either the injury-causing transaction or the transactions in which Defendants engaged in the alleged misconduct." (Id.) The Court therefore denied Defendants' motions for summary judgment because "Defendants' status as jurisdictional sellers during the relevant time period does not preclude the possibility that Defendants engaged in manipulative conduct in non-jurisdictional transactions, such as providing false price reports on non-jurisdictional transactions to trade indices, falling outside FERC's exclusive jurisdiction." (Id.)

Defendants moved the Court to reconsider its prior Order, arguing that under the NGA, FERC has jurisdiction over any practice by a jurisdictional seller which affects a

jurisdictional rate.  Defendants argued that because any alleged false price reports were reported to a common index, all false price reporting affected the jurisdictional rate, regardless of whether the false report itself was linked to jurisdictional or non-jurisdictional activity.  Plaintiffs opposed the motion, arguing Defendants' position was foreclosed by the Ninth Circuit's decision in E. & J. Gallo Winery v. Encana Corp., 503 F.3d 1027 (9th Cir. 2007), which Plaintiffs contended already rejected Defendants' preemption arguments. Plaintiffs also asserted that Defendants' argument would extend FERC jurisdiction in such a manner as to defeat the dual regulatory scheme envisioned by Congress by expanding FERC jurisdiction over any practice, even non-jurisdictional conduct, which would affect a jurisdictional rate.

The Court granted Defendants' motion to reconsider, holding that pursuant to 15 U.S.C. § 717d, FERC has jurisdiction to regulate any practice by a jurisdictional seller affecting a rate charged or collected by a jurisdictional seller in connection with the transportation or sale of natural gas within FERC's jurisdiction.  (Order (Doc. #1844) ("November 2, 2009 Order").)  Because FERC's jurisdiction has preemptive force where it exists, if FERC has jurisdiction over a jurisdictional seller's practices that affect jurisdictional rates, that jurisdiction is exclusive and preempts state law on the subject.  The Court thus held that "if Defendants were jurisdictional sellers and their alleged practices of false price reporting and wash trades were practices which directly affected a jurisdictional rate, the practices fall within FERC's exclusive jurisdiction, and Plaintiff's claims therefore will be preempted."  (Id. at 9.)  The Court directed Defendants to re-file their motions for summary judgment, along with any supplementation.  (Id. at 10.)

Defendants now move for summary judgment or partial summary judgment[5] in the remaining cases in this MDL.  Defendants contend no genuine issue of material fact

[5] Because the preemption doctrine impacts only state law claims, Defendants' motions are not directed at the federal antitrust claims which Plaintiffs have alleged in some of these MDL actions.

remains that they were jurisdictional sellers whose alleged practices of false price reporting and wash trades directly affected a jurisdictional rate because jurisdictional rates were set by reference to the indices which Plaintiffs allege Defendants manipulated. Specifically, Defendants contend they each were affiliated with a pipeline or local distribution company and sold gas for resale where such gas was not produced by said pipeline, local distribution company, or any affiliate. Defendants contend these sales for resale fall within FERC's exclusive jurisdiction, and thus they were jurisdictional sellers. Defendants argue that Plaintiffs' allegations that Defendants engaged in conduct that manipulated the price indices, taken as true solely for purposes of this motion, such conduct constitutes practices that would have directly affected any rate set using the indices. Finally, Defendants contend no genuine issue of material fact remains that jurisdictional rates were set using the price indices which Defendants allegedly manipulated. Defendants thus contend their alleged practices of false price reporting and wash trades directly affected a jurisdictional rate, and fall within FERC's exclusive jurisdiction.

Plaintiffs respond by seeking reconsideration of the Court's November 2, 2009 Order, and arguing their state law claims are not preempted. Plaintiffs further contend that false price reporting and wash trades are not "practices" as contemplated by § 717d because they are not traditional, habitual acts on the part of a natural gas company. Plaintiffs also argue Defendants' conduct did not directly affect a jurisdictional rate. Rather, Defendants conduct was aimed at the indices, which are not jurisdictional rates. Plaintiffs also take issue with Defendants' means of proof at the summary judgment stage. Plaintiffs contend Defendants cannot rely upon Plaintiffs' pleadings to establish no genuine issue of material fact remains and Defendants' supporting declarations are conclusory or the declarants lack personal knowledge of certain facts stated therein.

///

///

## II.       LEGAL STANDARD

Summary judgment is appropriate if the "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is "genuine" if sufficient evidence exists such that a reasonable fact finder could find for the non-moving party. Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002). Initially, the moving party bears the burden of proving there is no genuine issue of material fact. Leisek v. Brightwood Corp., 278 F.3d 895, 898 (9th Cir. 2002). After the moving party meets its burden, the burden shifts to the non-moving party to produce evidence that a genuine issue of material fact remains for trial. Id. The Court views all evidence in the light most favorable to the non-moving party. Id.

Reconsideration of a prior ruling is appropriate only in limited circumstances, such as the discovery of new evidence, an intervening change in controlling law, or where the initial decision was clearly erroneous or manifestly unjust. Nunes v. Ashcroft, 375 F.3d 805, 807-08 (9th Cir. 2004). A motion for reconsideration is not an avenue to re-litigate the same issues and arguments upon which the court already has ruled. Brogdon v. Nat'l Healthcare Corp., 103 F. Supp. 2d 1322, 1338 (N.D. Ga. 2000).

## III.      DISCUSSION

### A.  Reconsideration

Plaintiffs request the Court reconsider its November 2, 2009 ruling that § 717d preempts any state law claim that conflicts with FERC's exclusive jurisdiction over any

///

1   practice by a jurisdictional seller that directly affects a jurisdictional rate.[6]  Plaintiffs'

2   arguments generally are a rehashing of arguments this Court already has addressed, and the

3   Court finds no basis to alter its November 2, 2009 Order.  It suffices to say that while

4   Plaintiffs are correct that FERC has no jurisdiction over Plaintiffs' non-jurisdictional

5   transactions, FERC does have exclusive jurisdiction over any practice by a jurisdictional

6   seller that directly affects a jurisdictional rate.  Because FERC's jurisdiction is exclusive

7   where it exists, any state law claims based on any such practices are preempted, even if that

8   means Plaintiffs are left without a state law remedy.  (See Orders (Doc. #448, #547,

9   #1844).)  Victims of anti-competitive conduct are not left completely without a remedy, as

10  federal remedies exist.

11        Plaintiffs have failed to support their collateral estoppel argument because they

12  have presented no evidence that any Defendant or its privy in this action is subject to a final

13  judgment in which the preemption issue presently under consideration was decided against

14  that Defendant or its privy in a prior action.  The fact that a Defendant or its privy may have

15  lost rulings during the course of a case does not suffice to support collateral estoppel unless

16  there is a final judgment and the issue on which Plaintiffs seek to estop Defendants was

17  actually litigated and necessary to support the judgments.  Hydranautics v. FilmTec Corp.,

18  204 F.3d 880, 885 (9th Cir. 2000).  Further, the Court previously has explained that the

19  United States Court of Appeals for the Ninth Circuit did not address this precise preemption

20  issue in Gallo.  (Order (Doc. #1844) at 5.)

21        Plaintiff Multiut Corporation's reliance on In re NOS Communications, MDL

22  No. 1357 is unfounded, as that case dealt with the filed rate doctrine and complete

23

---

24        [6]  The Court recognizes that some Plaintiffs, such as the Wisconsin-based Plaintiffs, have not
     previously briefed the preemption question, as Defendants' prior motions for summary judgment were

25  filed only in JPMorgan and Learjet.  The Court considers these Plaintiffs' arguments under the usual
     summary judgment standard, rather than as a motion for reconsideration, but finds no basis to deviate

26  from the reasoning set forth in the November 2, 2009 Order in these cases.

preemption, and neither doctrine is applicable to the present preemption question.  495 F.3d

1052 (9th Cir. 2007).  The Court also rejects Plaintiff Sinclair Oil Corporation's argument

that its contractual choice-of-law provision in favor of Oklahoma law overrides federal

preemption principles.  Because Oklahoma law includes federal law, federal preemption

principles control.  See Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 157 &

n.12 (1982) (stating "a fundamental principle in our system of complex national polity

mandates that the Constitution, laws, and treaties of the United States are as much a part of

the law of every State as its own local laws and Constitution" (quotation omitted)).  Further,

the Court reiterates that Sinclair Oil Corporation's contracts with ONEOK Energy Services

Company, L.P.'s ("ONEOK") are not subject to FERC's jurisdiction.  Thus, for example, if

Sinclair Oil Corporation brought a breach of contract claim against ONEOK based on

ONEOK's alleged failure to deliver the agreed upon volume of natural gas, FERC would

have no jurisdiction over the dispute even if the price at which that gas was sold was the

result of ONEOK's participation in a conspiracy to manipulate the indices from which both

jurisdictional and non-jurisdictional rates are determined.  Such a claim would not implicate

the alleged practice of manipulating a jurisdictional rate.

### B.  Jurisdictional Sellers

Defendants contend no genuine issue of material fact remains that Defendants are

jurisdictional sellers because they are affiliated with a pipeline or local distribution

company and sold gas for resale which was not produced by said pipeline, local distribution

company, or any affiliate.  Defendants provide in support various affidavits and records

purporting to show affiliation and sales of gas not produced by affiliated entities.  Plaintiffs

respond by challenging Defendants' evidentiary production, arguing that Defendants make

only conclusory averments of affiliation.  Plaintiffs also contend that affiliation under the

pertinent law is determined by control, and in prior briefing in these MDL proceedings,

certain Defendants have denied they controlled other Defendants.  Plaintiffs also dispute the

showing in some instances of whether certain gas sales were jurisdictional because Defendants have failed to show the sales were for unaffiliated gas and Defendants made no accounting for gas from Canada or Mexico.

Pursuant to the NGA, FERC has jurisdiction over "the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale."  15 U.S.C. § 717(b). However, Congress has removed "first sales" from FERC's jurisdiction.  15 U.S.C. § 3431(a)(1)(A); Gallo, 503 F.3d at 1037.  Despite a rather complex statutory definition,[7] first sales are "in essence, merely sales of natural gas that are not preceded by a sale to an

///

///

///

///

///

_____

[7] (A) General rule
The term "first sale" means any sale of any volume of natural gas-
     (i) to any interstate pipeline or intrastate pipeline;
     (ii) to any local distribution company;
     (iii) to any person for use by such person;
     (iv) which precedes any sale described in clauses (i), (ii), or (iii); and
     (v) which precedes or follows any sale described in clauses (i), (ii), (iii), or
         (iv) and is defined by the Commission as a first sale in order to prevent
         circumvention of any maximum lawful price established under this chapter.
  (B) Certain sales not included
Clauses (i), (ii), (iii), or (iv) of subparagraph (A) shall not include the sale of any volume of natural gas by any interstate pipeline, intrastate pipeline, or local distribution company, or any affiliate thereof, unless such sale is attributable to volumes of natural gas produced by such interstate pipeline, intrastate pipeline, or local distribution company, or any affiliate thereof.

15 U.S.C. § 3301(21).

interstate pipeline,[8] intrastate pipeline,[9] local distribution company,[10] or retail

customer.  In other words, sales by pipelines, local distribution companies, and their

affiliates cannot be first sales unless these entities are selling gas of their own production."

Gallo, 503 F.3d at 1037.  Thus, FERC's jurisdiction under the NGA "includes all sales for

resale by interstate and intrastate pipelines and [local distribution companies] and their

affiliates, other than their sales of their own production."  National Association of Gas

Consumers v. All Sellers of Natural Gas in the United States of America in Interstate

Commerce, 106 F.E.R.C. ¶ 61,072, ¶ 61248 (Jan. 29, 2004).

The importation of Canadian and Mexican natural gas also constitutes a first sale.

15 U.S.C. § 717b(b)(1) ("With respect to natural gas which is imported into the United

States from a nation with which there is in effect a free trade agreement requiring national

treatment for trade in natural gas . . . the importation of such natural gas shall be treated as a

'first sale' within the meaning of section 3301(21) of this title").  However, imported gas

does not retain "first sale" status regardless of whether the transaction at issue constitutes a

"first sale" under the statutory definition.  Pacific Interstate Transmission Company, 66

F.E.R.C. ¶ 61,369, ¶ 62,227 (Mar. 30, 1994).  Rather, as FERC has explained, Congress

intended to "treat[] the international border as the equivalent of a wellhead."  Id. ¶ 62,228.

Because Congress defined importation of such gas as a "first sale," a statutorily defined

term, and because Congress also specifically prohibited preferential treatment for such

///

[8]   An interstate pipeline means any person engaged in natural gas transportation subject to FERC's jurisdiction.  15 U.S.C. § 3301(15).

[9]   An intrastate pipeline means any person engaged in natural gas transportation, not including gathering, which is not subject to FERC's jurisdiction.  15 U.S.C. § 3301(16).

[10]   A local distribution company is any person other than a pipeline, engaged in the transportation or local distribution of natural gas and the sale of natural gas for ultimate consumption.  15 U.S.C. § 3301(17).

gas,[11] imported gas from Mexico or Canada does not retain "first sale" status unless it otherwise meets the statutory definition of a first sale.  Id. ¶¶ 62,227-29.

An affiliate, "when used in relation to any person, means another person which controls, is controlled by, or is under common control with such person."  15 U.S.C. § 3301(27).  Under pertinent regulations in effect during the relevant time period, control "include[d], but [was] not limited to, the possession, directly or indirectly and whether acting alone or in conjunction with others, of the authority to direct or cause the direction of the management or policies of a company.  A voting interest of 10 percent or more create[d] a rebuttable presumption of control."  18 C.F.R. § 161.2(b) (2000).

FERC interpreted control to mean the ability to exercise control.  Iroquois Gas Transmission Sys., L.P., 78 F.E.R.C. ¶ 61,108, ¶ 61,377, ¶ 61,379 (Feb. 4, 1997) (holding one of ten owners had control where partner could cast a negative vote on proposals that required a seventy-five percent majority, even though day-to-day operations were controlled by an independent management company); Kern River Gas Transmission Co., 67 F.E.R.C. ¶ 61,027, ¶ 61,089 (Apr. 6, 1994) (concluding that each partner had control where general partnership agreement had a unanimous approval requirement because each partner had "veto power over any decision by simply withholding its vote").  The United States Court of Appeals for the D.C. Circuit likewise indicated the question was not whether actual control was exercised, but whether the "management structure or some incompatibility of economic interests" rebutted the presumption that persons with ten percent or more ownership interests could, acting alone or in conjunction with others, exercise the authority to direct or cause the direction of the management or policies of a company.  Tenneco Gas v. F.E.R.C., 969 F.2d 1187, 1212-13 (D.C. Cir. 1992).  Thus, while evidence of actual control would provide powerful evidence of authority to control, evidence of the exercise of that authority

[11] "[T]he Commission shall not, on the basis of national origin, treat any such imported natural gas on an unjust, unreasonable, unduly discriminatory, or preferential basis."  15 U.S.C. § 717b(b)(2).

13

is not required to establish affiliate status.

### 1. Dynegy Defendants

During the relevant time period, Defendant Dynegy Marketing and Trade ("DMT") was a wholly owned subsidiary of Defendant Dynegy, Inc. ("Dynegy"). (Defs.' Joint Appx. in Support of Renewed Mot. & Mot. for Summ. J. Based on Fed. Preemption (Doc. #1882) ["Jt. Appx."], Ex. 3-A at ¶ 9.) In November 1999, Dynegy acquired Illinova Corporation and its wholly-owned subsidiary, Illinois Power Company, a local distribution company which provided retail natural gas service to 400,000 customers in Illinois. (Id. ¶ 11 & Attachs. A, B.) Dynegy indirectly wholly owned Illinois Power Company until 2004. (Id. ¶¶ 12-13 & Attach. B.) Because Dynegy wholly owned both DMT and indirectly wholly owned Illinois Power Company during the relevant period, DMT was under common control with a local distribution company.

DMT was a natural gas marketer which bought natural gas and resold it to other gas marketers, local utilities, and others. (Jt. Appx., Ex. 3-A at ¶ 10.) DMT did not produce natural gas during the relevant period. (Id. ¶ 14.) Rather, during the relevant period, DMT sold gas from various third party suppliers, none of which were affiliated with DMT, including Anadarko Energy Services Company ("Anadarko"); Altrade Transaction, L.L.C. ("Altrade"), El Paso Merchant Energy, L.P. (currently known as El Paso Marketing, L.P.), Sempra Energy Trading Corp. ("SET"), and Southern Company Energy Trading ("Southern"). (Id. ¶ 16.) DMT sold the gas it purchased from unaffiliated third parties to various other unaffiliated third parties, including SET, AEP Energy Services, Inc. ("AEPES"), and El Paso Merchant Energy, L.P. (Id. ¶ 17.) SET, AEPES, and El Paso Merchant Energy L.P. resold all of the gas they purchased during the relevant period. (Jt. Appx., Exs. 8-E, 8-G, 8-H.) DMT thus has established no genuine issue of material fact remains that it made sales for resale of natural gas other than its own or its affiliates' production, and was a jurisdictional seller.

Plaintiffs[12] make two attacks on the Dynegy Defendants' proffer of evidence. First, Plaintiffs argue the Dynegy Defendants offer no evidence Dynegy exercised actual control over DMT or Illinois Power Company.  However, as the Court stated above, the applicable regulations at the time required only the authority to control, and a ten percent ownership interest creates a rebuttable presumption of such authority.  The Dynegy Defendants have presented evidence that Dynegy directly wholly owned DMT, and indirectly wholly owned Illinois Power Company.  The Dynegy Defendants thus have raised the rebuttable presumption of authority to control, and Plaintiffs have presented no evidence to suggest Dynegy did not have the authority to control either of its wholly owned subsidiaries.

Second, Plaintiffs contend that the affiant, Victor Cabrera, upon which the Dynegy Defendants rely to prove sales for resale lacks personal knowledge as to whether the entities to which DMT sold natural gas resold the gas.  However, the Dynegy Defendants have presented other affidavits from persons with knowledge from the entities to which DMT sold gas indicating that all gas those entities purchased was for resale. Consequently, Defendants have established no genuine issue of material fact remains that DMT was affiliated with a local distribution company, and it made sales for resale other than its own or its affiliates' production.  No genuine issue of material fact remains that DMT was a jurisdictional seller during the relevant time period.

## 2.  Coral Energy Resources, L.P.

During the relevant period, Defendant Coral Energy Resources, L.P. ("Coral") was ninety-nine percent owned by Coral Energy Holding, L.P. ("CEP").  (Supp. Joint

---

[12]  Plaintiff Multiut Corporation states that it "cannot dispute that Dynegy engaged in the conduct which Dynegy claims provide it with immunity from fraud, i.e., stock ownership in Illinois Power (a local distribution company) . . . ."  (Multiut Corporation's Opp'n to Dynegy Inc. & Dynegy Marketing & Trade's Mot. for Partial Summ. J. at 2.)

Appx., Ex. 53 at ¶ 4.)  According to Robert Reilley ("Reilley"), Vice President of Regulatory Affairs for Shell Energy North America (US) L.P., CEH in turn was indirectly wholly-owned by "Shell" from January 1, 2000 through December 2000, and thereafter, "Shell" indirectly owned 90.4% of CEH.  (Id.)  Reilley defines "Shell" as "Shell Oil Company and/or Royal Dutch Shell."  (Id. ¶ 2.)

Reilley also states that during this same period, other "Shell" owned entities were or owned natural gas pipelines.  (Jt. Appx. Ex. 43 ¶ 3; Supp. Jt. Appx., Ex. 53 at ¶¶ 2-4.)  For example, Reilley states that "Shell" indirectly owned over 10% interests in Shell Gas Pipeline Company; Shell Gas Transmission LLC; Mississippi Canyon Gas Pipeline, LLC; Garden Banks Gas Pipeline, LLC; Manta Ray Offshore Gathering Company; Nautilus Pipeline Company LLC; Stingray Pipeline, LLC; Starfish Pipeline Company, LLC; Tejas Gas LLC; and Tejas Gas Pipeline, L.P.  (Supp. Jt. Appx., Ex. 53 at ¶ 4.)  Because Reilley refers to two companies as "Shell," and does not identify which Shell company owns what interests in Coral and the other companies identified, Reilley's affidavit does not establish that Coral and any of the identified pipeline companies are under common control.

Coral also attempts to show pipeline affiliation through FERC orders.  The first FERC order states that Mississippi Canyon Gas Pipeline LLC formerly was known as Shell Gas Pipeline Company.  (Jt. Appx., Ex. 6-A, Ex. A.)  However, the mere fact that a pipeline had the word "Shell" in its name does not support a finding of affiliation.  Coral presents no evidence of the ownership structure of either Mississippi Canyon Gas Pipeline LLC or Shell Gas Pipeline Company, nor ties that ownership structure to Coral.  The second FERC order states that Starfish Pipeline Company, LLC ("Starfish") purchased Stingray Pipeline Company, LLC from Deepwater Holdings, LLC.  (Jt. Appx., Ex. 6-A, Ex. B.)  The FERC order further states that Starfish is owned equally by Shell Gas Transmission, LLC and Enterprise Products Operating, L.P.  (Id.)  Again, however, the mere mention of "Shell" in a company's name does nothing to establish affiliation.  Coral has provided no evidence of

the corporate structures and ownership interests between Coral, "Shell," and these other entities sufficient to establish affiliation.

Coral also cites to City of Moundridge, KS v. Exxon Mobil Corp. as an example of a court case finding Coral is subject to FERC jurisdiction. 471 F. Supp. 2d 20, 44 (D.D.C. 2007). However, Coral has not provided this Court with the evidence supporting that conclusion, and it appears the court in City of Moundridge was evaluating a different relevant time period.

Although the above showings are insufficient, Coral was the subject of several FERC orders in which FERC exercised jurisdiction over Coral during the relevant time period for the very conduct at issue in this case. In April 2003, FERC directed Coral and several other companies to "demonstrate that they have fixed their internal processes for reporting trading data to the trade press or that they no longer sell natural gas at wholesale." Order Directing Submission of Information with Respect to Internal Processes for Reporting Trading Data, 103 F.E.R.C. ¶ 61,089, ¶ 61,286 (Apr. 30, 2003). Coral responded to this direction by indicating that it was continuing to report price information to index publishers, that it had in place a code of conduct for price reporting, and that it had not disciplined any employees because it had determined none of its employees had engaged in false price reporting. Order Accepting Submission of Information with Respect to Internal Processes for Reporting Trading Data, 104 F.E.R.C. ¶ 61,153, ¶ 61,544 (July 29, 2003). In March 2005, FERC and Coral entered into a stipulation and consent agreement related to Coral's alleged manipulation of natural gas prices pursuant to which Coral paid $3.5 million to an organization providing assistance to low-income energy consumers. Order Approving Stipulation and Consent Agreement, 110 F.E.R.C. ¶ 61,205, ¶ 61,768 (Mar. 3, 2005). In this order, FERC noted its jurisdiction was based on wholesale sales of natural gas. Id.

FERC's actual exercise of jurisdiction over Coral during the relevant time period for the same conduct at issue in this case is evidence that Coral was a jurisdictional seller.

Plaintiffs have not presented any evidence that Coral was not a jurisdictional seller during the relevant time frame. No genuine issue of material fact remains that Coral was a jurisdictional seller during the relevant time period.

### 3.  AEP Defendants

During the relevant time period, Defendant AEP Energy Services, Inc. ("AEPES") was an indirect wholly owned subsidiary of Defendant American Electric Power Co. ("AEP"). (Jt. Appx., Ex. 46 at ¶ 2.)  In January 2005, FERC entered into a stipulation and consent agreement with AEP and two of its subsidiaries, AEPES and American Electric Power Service Corporation, in relation to preferences AEP's pipelines gave to their "affiliated marketer," AEPES.  (Jt. Appx., Ex. 26, Attach. C.)

In April 2003, FERC directed AEP and several other companies to "demonstrate that they have fixed their internal processes for reporting trading data to the trade press or that they no longer sell natural gas at wholesale." Order Directing Submission of Information with Respect to Internal Processes for Reporting Trading Data, 103 F.E.R.C. ¶ 61,089, ¶ 61,286 (Apr. 30, 2003).  In response, AEPES, AEP Power Marketing, Inc., and AEP Service Corporation reported that they intended to continue to report transactions to the indices, and would do so consistent with FERC's Policy Statement on price reporting. Order Accepting Submission of Information with Respect to Internal Processes for Reporting Trading Data, 104 F.E.R.C. ¶ 61,153, ¶ 61,544 (July 29, 2003); (Jt. Appx., Ex. 26, Attachs. A, B.)

FERC's actual exercise of jurisdiction over the AEP Defendants during the relevant time period for the same conduct at issue in this case is evidence that the AEP Defendants were jurisdictional sellers.  Plaintiffs have not presented any evidence that the AEP Defendants were not jurisdictional sellers during the relevant time frame.  Instead, Plaintiffs argue that AEP previously took the position that AEP did not exercise control over AEPES.  However, as discussed above, affiliate status is determined by having the

1    authority to control, not the actual exercise of such authority.  No genuine issue of material

2    fact remains that AEPES was a jurisdictional sellers during the relevant time period.

3                          4.  Reliant Defendants

4          During the relevant time period, Reliant Energy Services, Inc. ("RES") was the

5    wholly owned subsidiary of Reliant Energy Inc. ("REI").[13]  (Jt. Appx., Ex. 9-A at ¶ 2.)  In

6    October 2003, FERC entered into a stipulation and consent agreement with Reliant Energy

7    Services, Inc.; Reliant Energy Coolwater, Inc.; Reliant Energy Ellwood, Inc.; Reliant

8    Energy Etiwanda, Inc.; Reliant Energy Mandalay, Inc.; and Reliant Energy Ormand Beach

9    Inc. regarding, among other things, issues raised in FERC's Final Report on Price

10   Manipulation in Western Markets.  Order Approving Stipulation and Consent Agreement,

11   105 F.E.R.C. ¶ 61,008 (Oct. 2, 2003.)  In the order approving the stipulation and consent

12   agreement, FERC concluded it had jurisdiction over RES due in part to "trading in the

13   wholesale gas market."  Id. ¶ 61,016.  Specifically, FERC concluded it had "jurisdiction

14   over Reliant's trades at Topock and has exercised that jurisdiction in reviewing such

15   trades."  Id.  FERC stated that "Reliant's trading at Topock on EnronOnline ('EOL')

16   constituted trading in the wholesale market and was undertaken pursuant to a blanket

17   marketing certificate issued by the Commission.  . . .  During 2000 and 2001, Reliant was

18   an affiliate of an interstate pipeline and thus its sales were not 'first sales . . . .'"  Id.

19         FERC's actual exercise of jurisdiction over RES during the relevant time period

20   for the same conduct at issue in this case is evidence that RES was a jurisdictional seller.

21   Plaintiffs have not presented any evidence that the RES was not a jurisdictional seller

22   during the relevant time frame.  Instead, Plaintiffs argue that REI previously took the

23   position that it did not exercise control over RES.  However, as discussed above, affiliate

24   status is determined by having the authority to control, not the actual exercise of such

25

26         [13] The Court previously has detailed REI's formation from former REI and Reliant Resources,
     Inc.  (Order (Doc. #1515).)

                                      19

authority.  No genuine issue of material fact remains that the RES was a jurisdictional seller during the relevant time period.

### 5.  ePrime Defendants

From January 1, 2000 through August 2000, New Century Energies, Inc. ("New Century") was a public utility holding company.  (Jt. Appx., Ex. 7-A at ¶ 1.)  In August 2000, New Century merged with Northern States Power Company, and the new entity changed its name to Xcel Energy Inc. ("Xcel").  (Id. ¶ 2.)  Prior to the merger, Defendant ePrime, Inc. ("ePrime") was a wholly owned subsidiary of NC Enterprise, Inc., which was a wholly owned subsidiary of New Century.  (Id. ¶ 3.)  ePrime subsequently became the wholly owned subsidiary of Xcel Energy Markets Holdings Inc., which in turn was wholly owned by Defendant Xcel.  (Jt. Appx., Ex. 7-B at ¶ 2.)  Xcel also owned all outstanding shares of Northern States Power Co. (Wisconsin), a local distribution company.  (Request for Judicial Notice[14] (Doc. #1917), Ex. A at 3, 7.)  New Century was not a producer of natural gas, nor were any of its subsidiaries, including ePrime.  (Jt. Appx., Ex. 7-A at ¶¶ 5-6.)  During the relevant time period, all sales ePrime made were to utilities or others for resale.  (Jt. Appx., Ex. 7-B at ¶ 6.)

Defendants ePrime and Xcel have presented evidence that ePrime was affiliated with a local distribution company and made sales for resale which were not of its own or its affiliates' production.  Plaintiffs do not challenge any of this evidence except whether Defendants adequately established ePrime is affiliated with a local distribution company. However, Defendants have presented evidence that ePrime was affiliated with Northern States Power Co., a local distribution company in Wisconsin, as both ePrime and Northern

---

[14]  The Court takes judicial notice of the fact of the SEC filing, but does not take judicial notice of the truth of the facts stated therein.  Lee v. City of L.A., 250 F.3d 668, 689 (9th Cir. 2001). However, the SEC filing is signed pursuant to the requirements of the Securities Exchange Act of 1934, and the Court will consider the statements therein as evidence of the asserted facts.

States Power Co. were directly or indirectly wholly owned by Xcel.  No genuine issue of
material fact remains that ePrime was a jurisdictional seller during the relevant period.

### 6.  El Paso Defendants

During the relevant period, El Paso Corporation indirectly owned 100% of the
voting and equity interest in El Paso Marketing, L.P., which during that time was known as
El Paso Merchant Energy, L.P.  (Jt. Appx., Ex. 55 at ¶ 2.)  During this same period of time,
El Paso Corporation indirectly owned 100% of the voting and equity interest in El Paso
Natural Gas Company, which was an interstate pipeline.  (Id. ¶ 3.)  El Paso Marketing, L.P.
was in the business of marketing and trading natural gas, which it sold to third parties, such
as AEPES, DMT, Enron North America Corporation, ONEOK Energy Marketing &
Trading Company, L.P., RES, SET, and Southern California Gas Company.  (Jt. Appx., Ex.
15-A at ¶¶ 6-8.)  SET, DMT, Enron North America Corporation, and AEPES resold all of
the gas they purchased during the relevant period.  (Jt. Appx., Exs. 8-B, 8-E, 8-I, 9-C.)
RES, Southern, and ONEOK Energy Marketing & Trading Company, L.P. sold
substantially all of the natural gas they purchased.  (Jt. Appx., Exs. 8-A, 8-C, 8-H.)  El Paso
Marketing, L.P. obtained over 1,289,915,275 MMBtu of gas which was produced by its
affiliates.  (Jt. Appx., Ex. 15-A at ¶ 7.)  El Paso Marketing L.P. sold 1,877,238, 602 MMBtu
of gas to AEPES, DMT, Enron North America Corporation, and SET.  (Id.)  El Paso
Marketing, L.P. thus sold more gas to these entities than El Paso Marketing L.P. obtained
from its affiliates, and these entities resold all gas they purchased.

As with other Defendants, FERC exercised jurisdiction over El Paso Marketing
L.P. by directing it to demonstrate that it had fixed its internal processes for reporting
trading data to the trade press or that it "no longer" sold natural gas at wholesale.  Order
Directing Submission of Information with Respect to Internal Processes for Reporting
Trading Data, 103 F.E.R.C. ¶ 61,089, ¶ 61,286 (Apr. 30, 2003).  El Paso Marketing L.P.,
then known as El Paso Merchant Energy, LP, responded by admitting that at least one of its

employees provided inaccurate information to index publishers, and by indicating that it was going to shut down its trading operations.  Order Accepting Submission of Information with Respect to Internal Processes for Reporting Trading Data, 104 F.E.R.C. ¶ 61,153, ¶ 61,544 (July 29, 2003).  FERC's exercise of jurisdiction over El Paso Marketing L.P. during the relevant period for the very conduct at issue in this case is evidence that El Paso Marketing L.P. was a jurisdictional seller.

Defendant El Paso Marketing, L.P. has presented evidence that it was affiliated with a pipeline and made sales for resale which were not of its own or its affiliates' production.  Plaintiffs do not challenge any of this evidence except whether El Paso Marketing, L.P. adequately established it was affiliated with a pipeline.  However, Defendants have presented evidence that El Paso Marketing, L.P. was affiliated with El Paso Natural Gas Company, as both El Paso Marketing, L.P. and El Paso Natural Gas Company were indirectly wholly owned by El Paso Corporation.  No genuine issue of material fact remains that El Paso Marketing, L.P. was a jurisdictional seller during the relevant period.

### 7. The Williams Defendants

During the relevant time period, Williams Power Company was a wholly owned subsidiary of Williams Merchant Services Company, Inc.  (Supp. Jt. Appx., Ex. 56 at ¶ 4.) Williams Merchant Services Company was a wholly owned subsidiary of Williams Energy Services, LLC.  (Id.)  Williams Energy Services, LLC was a wholly owned subsidiary of The Williams Companies, Inc.  (Id.)  During the relevant time period, Williams Gas Pipeline Company was a wholly owned subsidiary of The Williams Companies, Inc.  (Id.) Williams Gas Pipeline Company owned interstate pipelines, including three wholly-owned subsidiary pipeline companies, Transcontinental Gas Pipe Line Corporation, Northwest Pipeline Corporation, and Texas Gas Transmission Corporation.  (Id.)

///

22

Williams Exploration & Production ("WEP") is a business unit of The Williams Companies, Inc.  (Jt. Appx., Ex. 14-A at ¶ 5.)  WEP produces natural gas.  (Id.)  During the relevant period, Williams Power Company obtained 373,257,814 MMBtu from WEP.  (Id. ¶ 8.)  Williams Power Company sold natural gas produced by WEP as well as gas produced by unaffiliated third parties.  (Id. ¶ 6.)  Williams Power Company made these sales to various third parties such as AEPES, DMT, Enron North America Corporation, SET, El Paso Merchant Energy, L.P., RES, and Southern.  (Jt. Appx., Ex. 14-B at ¶ 4.)  SET, DMT, Enron North America Corporation, El Paso Merchant Energy, L.P., and AEPES resold all of the gas they purchased during the relevant period.  (Jt. Appx., Exs. 8-B, 8-E, 8-G, 8-I, 9-C.)  RES, Southern, and ONEOK Energy Marketing & Trading Company, L.P. sold substantially all of the natural gas they purchased.  (Jt. Appx., Exs. 8-A, 8-C, 8-H.)  Williams Power Company sold more natural gas to these entities than it obtained from WEP during the relevant period.  (Jt. Appx., Ex. 14-A at ¶ 8, Ex. 14-B at ¶ 4.)  Consequently, Williams Power Company sold at least some natural gas for resale that was not its affiliate's production.

Defendant Williams Power Company has presented evidence that it was affiliated with a pipeline and made sales for resale which were not of its own or its affiliates' production.  Plaintiffs do not challenge any of this evidence except whether Williams Power Company adequately established it was affiliated with a pipeline.  However, Defendants have presented evidence that Williams Power Company was affiliated with Transcontinental Gas Pipe Line Corporation, Northwest Pipeline Corporation, and Texas Gas Transmission Corporation, as all of these entities were indirectly wholly owned by The Williams Companies.  Further, as discussed above, Defendants need not show The Williams Companies exercised actual control to show affiliation.  No genuine issue of material fact remains that Williams Power Company was a jurisdictional seller during the relevant period.

## 8.  The CMS Defendants

Defendant CMS Energy Corporation is a holding company which indirectly wholly owned two subsidiaries which engaged in trading of natural gas, CMS Marketing, Services and Trading ("MS&T") and CMS Field Services ("Field Services").  (Jt. Appx., Ex. 45 ¶¶ 6-7.)  MS&T was a wholly owned subsidiary of CMS Enterprises Company.  (Supp. Jt. Appx., Ex. 54 at ¶ 5.)  CMS Enterprises Company was a wholly-owned subsidiary of CMS Energy Corporation.  (Id. ¶ 9.)  Field Services was a wholly owned subsidiary of CMS Gas Transmission Company.  (Id. ¶ 6.)  CMS Gas Transmission Company wholly owned Panhandle Eastern Pipe Line Company, which owned and operated a natural gas pipeline network.  (Id. ¶ 7.)  During the relevant period, CMS Gas Transmission Company was a wholly-owned subsidiary of CMS Enterprises Company.  (Id. ¶ 8.)  Additionally, CMS Energy Corporation wholly owned Consumers Energy Company, a local distribution company located in Michigan.  (Id. ¶ 10.)

Although CMS Marketing Services purchased gas from an affiliate named CMS Oil & Gas, none of that gas was sold on the Trunkline pipeline.  (Jt. Appx., Ex. 44 at ¶ 4, ¶ 8.)  MS&T did not produce natural gas, and the only affiliated gas it purchased was from CMS Oil & Gas.  (Id. ¶¶ 10-11.)  MS&T purchased over 29 million MMBtu from CMS Oil & Gas.  (Id. ¶ 12.)  During that same period, MS&T sold more than 1.6 billion MMBtu, and thus it sold more gas than it purchased from an affiliate.  (Id. ¶¶ 13-14.)  MS&T sold gas to AEPES, DMT, El Paso Merchant Energy, L.P., and Enron North American Corp. on the Trunkline pipeline.  (Id. ¶ 15.)  DMT, Enron North America Corporation, El Paso Merchant Energy, L.P., and AEPES resold all of the gas they purchased during the relevant period.  (Jt. Appx., Exs. 8-B, 8-G, 8-I, 9-C.)

Additionally, as with some of the other Defendants previously discussed, FERC exercised jurisdiction over MS&T, directing it to demonstrate that it had fixed its internal processes for reporting trading data to the trade press or that it "no longer" sold natural gas

at wholesale.  Order Directing Submission of Information with Respect to Internal Processes for Reporting Trading Data, 103 F.E.R.C. ¶ 61,089, ¶ 61,286 (Apr. 30, 2003).  MS&T responded by admitting that at least one of its employees provided inaccurate information to index publishers, and by indicating that it was going to shut down its trading operations.  Order Accepting Submission of Information with Respect to Internal Processes for Reporting Trading Data, 104 F.E.R.C. ¶ 61,153, ¶ 61,544 (July 29, 2003).  FERC's exercise of jurisdiction over MS&T during the relevant period for the very conduct at issue in this case is evidence that MS&T was a jurisdictional seller.

Field Services did not produce natural gas and did not purchase gas from any affiliated entity. (Jt. Appx., Ex. 44 at ¶ 21-22.)  Field Services sold gas to AEPES, DMT, El Paso Merchant Energy, L.P., and SET.  (Id. ¶ 23.)  DMT, El Paso Merchant Energy, L.P., and AEPES resold all of the gas they purchased during the relevant period.  (Jt. Appx., Exs. 8-B, 8-G, 8-I.)

Defendants have presented evidence that MS&T and Field Services were affiliated with a pipeline and a local distribution company, and made sales for resale which were not of their own or their affiliates' production.  Plaintiffs do not challenge any of this evidence except whether MS&T or Field Services adequately established they were affiliated with a pipeline or local distribution company.  However, Defendants have presented evidence that MS&T and Field Services were affiliated with Panhandle Eastern Pipe Line Company and Consumers Energy Company, as all of these entities were indirectly wholly owned by CMS Energy Corporation.  Further, as discussed above, Defendants need not show CMS Energy Corporation exercised actual control to show affiliation.  No genuine issue of material fact remains that MS&T and Field Services were jurisdictional sellers during the relevant period.

///

///

### 9.  Duke Energy Defendants

Duke Energy Carolinas, LLC was formerly known as Duke Energy Corporation ("DEC").  (Jt. Appx., Ex. 4-A at ¶ 1.)  DEC was formed in 1997 through a merger between Duke Power Company, a local electric utility, and PanEnergy Corporation, which owned subsidiaries that operated interstate natural gas pipelines.  (Id. ¶ 2.)  During the relevant period, DEC indirectly owned the entire ownership interest in the interstate and intrastate pipelines Texas Eastern Transmission, Algonquin Gas Transmission, and East Tennessee Natural Gas.  (Id. ¶ 6.)  None of these pipelines, or their subsidiaries or affiliates, produced natural gas.  (Id.)  DEC also was affiliated with Duke Energy Hydrocarbons LLC, which invested in oil and gas exploration prospects, but did not produce natural gas during the relevant period.  (Id. ¶ 9.)

DEC indirectly owned a sixty percent interest in Duke Energy Trading and Marketing, L.L.C. ("DETM"), which marketed natural gas in the United States.  (Id. ¶¶ 4-5.)  ExxonMobil Corporation ("ExxonMobil") indirectly owned the other forty percent interest in DETM.  (Id.)  Neither DEC nor DETM produced natural gas.  (Id. ¶¶ 3, 5.)  ExxonMobil, however, may have had subsidiaries which produced natural gas which was sold to DETM, which DETM subsequently resold.  (Id. ¶ 10.)  Other than ExxonMobil subsidiaries and Duke Energy Hydrocarbons, LLC, no other entities affiliated with DEC, DETM, or the pipelines produced natural gas or acquired natural gas from gas-producing wells in which they had invested.  (Id. ¶ 11.)

During the relevant period, DETM purchased 885,322,125 MMBtu of natural gas from ExxonMobil subsidiaries.  (Jt. Appx., Ex. 49 at ¶ 2.)  DETM also purchased 265,674 MMBtu of natural gas from Duke Energy Hydrocarbons LLC.  (Id. ¶ 3.)  During this same period, DETM sold 2,711,693,949 MMBtu of natural gas to various third party entities, including AEPES, El Paso Merchant Energy, Enron North America Corporation, SET, and DMT.  (Id. ¶ 4.)  DETM sold more gas to these entities than it purchased from any

affiliates.  (Id. ¶¶ 2-4.)  Each of these entities resold all quantities of gas they purchased.

(Jt. Appx., Exs. 8-B, 8-E, 8-G, 8-I, 9-C.)

In December 2003, DETM entered into a stipulation and agreement with FERC

to resolve outstanding issues in relation to FERC's Final Report on Price Manipulation in

Western Markets.  Order Approving Stipulation and Consent Agreement, 105 F.E.R.C.

¶ 61,307 (Dec. 19, 2003).  In this order, FERC stated that it "exercised exclusive federal

jurisdiction under 15 U.S.C. § 3301(21)" over DETM based on DETM's "natural gas trades

in the wholesale gas market, in the investigation of 'wash trades.'"  Id. ¶ 62,470.

Defendant DETM has presented evidence that it was affiliated with a pipeline

and made sales for resale which were not of its own or its affiliates' production.  Plaintiffs

do not challenge any of this evidence except whether DETM adequately established it was

affiliated with a pipeline.  Specifically, Plaintiffs note that the Duke Defendants previously

have denied that DEC controlled DETM due to the corporate structure of DETM and

ExxonMobil's ability to veto any major activities by DETM.

As this Court set forth in a prior Order, DEC wholly owns Duke Capital

Corporation, which in turn wholly owns Pan Energy Corp.  (Order (Doc. #1529) at 5.)  Pan

Energy Corp. wholly owns Duke Energy Services, Inc., which wholly owns Duke Energy

Natural Gas Corporation.  (Id.)  Duke Energy Natural Gas Corporation wholly owns

DETMI Management, Inc.  (Id.)  DETMI Management, Inc. owns a sixty percent interest in

DETM.  (Id.)  Mobil Natural Gas, Inc. ("MNGI"), an indirect subsidiary of ExxonMobil,

owns the other forty percent of DETM.  (Id.)

DETM is run by a Management Committee consisting of three representatives

from the Duke Energy side and two representatives from the ExxonMobil side.  (Id. at 6.)

The Management Committee acts through the delegation of certain responsibilities and

authority to the managing member, which in 2001 and 2002 was DETMI Management, Inc.

(Id.)  Although DETMI Management, Inc. was the managing member, and through its

1   majority status on the committee could outvote the MNGI members on certain matters, the

2   limited liability company agreement mandated that "Material Actions" required unanimous

3   approval by the Management Committee.  (Id.; Am. & Restated Limited Liability Co.

4   Agreement (Doc. #1532) at 24, 26.)

5          FERC previously has indicated that "control" may be demonstrated by such veto

6   power.  In Iroquois Gas Transmission System, L.P., Iroquois Gas Transmission System,

7   L.P. ("Iroquois") was owned by ten partners, none of which managed or operated the

8   pipeline.  78 F.E.R.C. ¶ 61,108, ¶ 61,379 (Feb. 4, 1997).  Instead, an independent

9   management company controlled the pipeline's day-to-day operations.  Id. at ¶ 61,377,

10  61,379.  The ten partner owners were organized into three voting blocks.  Id. at ¶ 61,378.

11  One of the partners, TransCanada Iroquois Ltd. ("TCIL"), owned a 29% interest in

12  Iroquois, and owned 83% of the voting rights in one of the voting blocks.  Id.  The voting

13  agreement for this voting block required a 75% majority for some decisions.  Id.

14  Additionally, under the overall partnership agreement, some decisions required 75% of the

15  overall partnership vote.  Id.  FERC concluded that under these circumstances, TCIL "can

16  direct partnership policies by casting a negative vote on proposals that require a 75 percent

17  majority," and therefore TCIL had control authority under the pertinent regulation.  Id.

18         Here, DETM's limited liability company agreement provides that material actions

19  require unanimous approval of the management committee.  The management committee

20  includes DETMI Management, Inc., an indirect wholly owned subsidiary of DEC.

21  Consequently, DEC had the authority to control DETM through a negative vote on any

22  material actions.  As discussed elsewhere, and as is evident in Iroquois Gas Transmission

23  System, L.P., it is irrelevant whether DEC actually exercised control over DETM's day-to-

24  day operations.  DEC had the authority to exercise control as set forth in the applicable

25  regulation.  DETM thus has established it was affiliated with Texas Eastern Transmission,

26  Algonquin Gas Transmission, and East Tennessee Natural Gas because all of these entities

were subject to DEC's common control.

Moreover, FERC's actual exercise of jurisdiction over DETM during the relevant time period for the same conduct at issue in this case is evidence that DETM was a jurisdictional seller.  Plaintiffs have not presented any evidence that DETM was not a jurisdictional seller during the relevant time frame.  No genuine issue of material fact remains that DETM was a jurisdictional seller during the relevant time period.

<u>10.  ONEOK Defendants</u>

ONEOK Energy Services Company, L.P. ("OESC"), was a wholly owned subsidiary of ONEOK, Inc., and was a natural gas marketer that bought and sold natural gas.  (Jt. Appx., Ex. 12-A at ¶¶ 3, 7.)  During the relevant period, Oklahoma Natural Gas Company, Kansas Gas Service Company, and Texas Gas Service Company were local distribution companies and were public utility operating divisions of ONEOK, Inc.  (<u>Id.</u> ¶ 7.)

OESC obtained the natural gas it sold from either unaffiliated third parties or from ONEOK Resources Company, which was wholly owned by ONEOK, Inc.  (<u>Id.</u> ¶¶ 3-5, Ex. 12-B at ¶ 2.)  ONEOK Resources Company produced approximately 80,000,000 MMBtu of gas during the relevant period.  (Jt. Appx., Ex. 12-B at ¶ 3.)  During this same period, OESC sold over 249,000,000 MMBtu of gas to Enron Northern America Corp., DMT, AEPES, El Paso Marketing, L.P., and SET.  (Jt. Appx., Ex. 12-A at ¶ 6, Ex. 12-B at ¶ 3.)  DMT, Enron North America Corporation, El Paso Merchant Energy, L.P., and AEPES resold all of the gas they purchased during the relevant period.  (Jt. Appx., Exs. 8-B, 8-G, 8-I, 9-C.)

OESC has established that it was affiliated with local distribution companies, as it was under common control with ONEOK, Inc. and ONEOK, Inc. had divisions operating local distribution companies.  OESC also has established that it sold more gas to entities which resold the gas than it could have obtained from its producer-affiliate.  Consequently,

1   OESC has established that it was a jurisdictional seller.  Plaintiffs have presented no

2   evidence that OESC was not a jurisdictional seller.  No genuine issue of material fact

3   remains that DETM was a jurisdictional seller during the relevant time period.

4               **C.  Practice Affecting a Jurisdictional Rate**

5               Plaintiffs argue the word "practice" must be evaluated in light of the surrounding

6   terms to mean traditional activities that the company habitually engages in to determine

7   rates for transactions within FERC's jurisdiction.  Plaintiffs argue the alleged false price

8   reporting and wash trades are not traditional, habitual acts undertaken by natural gas

9   companies.  Rather, they are unlawful, anti-competitive acts with no legitimate business

10  purpose.  Plaintiffs contend that because FERC does not regulate antitrust activity and has

11  no authority to provide a remedy to victims of anti-competitive conduct, Defendants'

12  activities are not "practices" within § 717d's meaning.

13              Plaintiffs also argue Defendants fail to establish no issue of fact remains that

14  Defendants' conduct affected a jurisdictional rate because Defendants cannot rely on

15  Plaintiffs' pleadings unless Defendants agree to be bound to those facts throughout the

16  proceedings.  Plaintiffs also argue that even if Defendants could rely on Plaintiffs'

17  pleadings, Plaintiffs allege Defendants manipulated private price indices, which themselves

18  are not jurisdictional rates.

19              Defendants respond that practices need not be limited to the jurisdictional context

20  themselves, so long as they affect a jurisdictional rate.  Further, Defendants contend the

21  cases upon which Plaintiffs rely do not limit the term "practices" in the manner Plaintiffs

22  suggest.  Defendants contend that Plaintiffs are bound by their pleadings and any

23  admissions therein, including their allegations that Defendants manipulated the price

24  indices and that such manipulation would affect any rate which referred to the indices for a

25  price term.  Defendants assert they may rely on Plaintiffs' admissions without admitting

26  those facts for all purposes in this litigation.  Defendants further contend that it does not

matter whether Defendants actually manipulated the indices, it matters only that such practices would affect a jurisdictional rate, at which point FERC's exclusive jurisdiction attaches.

The NGA does not define the term "practice." However, in interpreting a related statutory provision which sets forth the reporting requirements for natural gas companies,[15] FERC has defined "practice" to mean a "'consistent and predictable course of conduct of the supplier that affects its financial relationship with the consumer.'" Transwestern Pipeline Co., 26 F.E.R.C. ¶ 63,008, ¶ 65,016 (Jan. 10, 1984) (quoting In Re Michigan Wisconsin Pipe Line Co., 34 F.P.C. 621, 626 (Aug. 30, 1965)); see also Cal. Indep. Sys. Operator Corp. v. Fed. Energy Regulatory Comm'n, 372 F.3d 395, 400 (D.C. Cir. 2004) (suggesting a practice is an action "habitually being taken by a utility in connection with a rate found to be unjust or unreasonable").

As the Court set forth in its prior Order, the word "practice" "is deemed to apply only to acts or things belonging to the same class as those meant by the words of the law that are associated with it." Mo. Pac. R. Co. v. Norwood, 283 U.S. 249, 257 (1931). In other words, it "must be interpreted to be consistent with the words around it," that is, it must be a practice affecting a rate demanded, observed, charged, or collected by a jurisdictional seller in connection with a jurisdictional sale. Metrophones Telecomm., Inc. v. Global Crossing Telecomm., Inc., 423 F.3d 1056, 1068 (9th Cir. 2005). In determining

---

[15] Title 15 U.S.C. § 717c(c) provides:
Under such rules and regulations as the Commission may prescribe, every natural-gas company shall file with the Commission, within such time . . . and in such form as the Commission may designate, and shall keep open in convenient form and place for public inspection, schedules showing all rates and charges for any transportation or sale subject to the jurisdiction of the Commission, and the classifications, practices, and regulations affecting such rates and charges, together with all contracts which in any manner affect or relate to such rates, charges, classifications, and services.

its own jurisdiction, FERC has considered whether the practice at issue was a "principal determinant," or whether it had a "significant and direct" effect on jurisdictional rates.  See ISO New England, Inc., 122 F.E.R.C. ¶ 61,144, ¶¶ 61762-63 (Feb. 21, 2008) (stating the practice at issue was "one of the principal determinants" of price and had "a significant and direct effect on jurisdictional rates" and therefore FERC had jurisdiction under a similarly-worded statutory provision related to the electricity market);[16] Cal. Indep. Sys. Operator Corp., 119 F.E.R.C. ¶ 61,076, ¶ 552 (Apr. 20, 2007) (rejecting an argument that because almost any practice "affects" jurisdictional rates FERC's jurisdiction would be "limitless," and noting that the practice at issue was more than "tangentially related to jurisdictional rates"); see also Am. Gas Ass'n v. F.E.R.C., 912 F.2d 1496, 1506 (D.C. Cir. 1990) (stating that contracts which affect the jurisdictional rate "indirectly" do not fall within FERC's jurisdiction under § 717d).

The "rules, practices, or contracts 'affecting' the jurisdictional rate are not themselves limited to the jurisdictional context." Fed. Power Comm'n v. Conway Corp., 426 U.S. 271, 281 (1976) (interpreting 16 U.S.C. § 824(e)(a)).  But the term "practices" is "limited to those methods or ways of doing things on the part of the [natural gas company] that directly affect the rate or are closely related to the rate, not all those remote things beyond the rate structure that might in some sense indirectly or ultimately do so." Cal.

---

[16] Title 16 U.S.C. § 824e(a) sets forth FERC's authority in relation to electricity in language nearly identical to § 717d:

> Whenever the Commission, after a hearing held upon its own motion or upon complaint, shall find that any rate, charge, or classification, demanded, observed, charged, or collected by any public utility for any transmission or sale subject to the jurisdiction of the Commission, or that any rule, regulation, practice, or contract affecting such rate, charge, or classification is unjust, unreasonable, unduly discriminatory or preferential, the Commission shall determine the just and reasonable rate, charge, classification, rule, regulation, practice, or contract to be thereafter observed and in force, and shall fix the same by order.

Indep. Sys. Operator Corp., 372 F.3d at 403.  For example, practices involving general

corporate governance or employment decisions are not practices directly affecting a

jurisdictional rate.  Norwood, 283 U.S. at 257; Cal. Indep. Sys. Operator Corp., 372 F.3d at

400-02.  However, a long-distance communications carrier's refusal to compensate a

payphone operator when a caller uses a payphone to obtain free access to the carrier's lines

constitutes a "practice" under the Communications Act of 1934, § 201(b).[17]  Global

Crossing Telecomm., Inc. v. Metrophones Telecomm., Inc., 550 U.S. 45, 47-48 (2007).

        In the context of FERC's regulation of the wholesale natural gas market, FERC

has recognized the importance that the private price indices play in setting jurisdictional

rates:

> Price indices are widely used in bilateral natural gas and electric
> commodity markets to track spot and forward prices.  They are often
> referenced in contracts as a price term; they are related to futures
> markets and used when futures contracts go to delivery; basis
> differentials in indices are used to hedge natural gas transportation
> costs; indices are used in many gas pipeline tariffs to settle imbalances
> or determine penalties; and state commissions use indices as
> benchmarks in reviewing the prudence of gas or electricity purchases.
> Since index dependencies permeate the energy industry, the indices
> must be robust and accurate and have the confidence of market
> participants for such markets to function properly and efficiently.

Policy Statement on Natural Gas & Electric Price Indices, 104 F.E.R.C. ¶ 61,121, ¶ 61,404

(July 24, 2003).  In February 2003, FERC directed its staff to conduct a fact-finding

investigation into whether any entity manipulated natural gas markets in the western United

States since January 1, 2000.  Order Revoking Market-Based Rate Authorities &

Terminating Blanket Marketing Certificates, 103 F.E.R.C. ¶ 61,343, ¶¶ 62,295-96 (June 25,

2003).  As part of that investigation, FERC staff requested data from certain natural gas

---

[17]     All charges, practices, classifications, and regulations for and in
        connection with such communication service, shall be just and
        reasonable, and any such charge, practice, classification, or regulation
        that is unjust or unreasonable is declared to be unlawful.

47 U.S.C. § 201(b).

companies, including several of the Defendants in this MDL proceeding, regarding the companies' "past reporting practices." Order Directing Submission of Information With Respect to Internal Processes for Reporting Trading Data, 103 F.E.R.C. ¶ 61,089, ¶ 61,285 (Apr. 30, 2003).

Upon review of the submitted information, in April 2003, FERC directed certain companies, including several Defendants in these MDL proceedings, to "show that they have corrected their internal processes for reporting trade data to the trade press or that they no longer sell natural gas at wholesale . . . ." Id. FERC's investigation had revealed that the companies "had few, if any, formal procedures in place to ensure the accuracy of data reported to the trade press." Id. ¶ 61,286. Among the practices FERC's investigation uncovered were reporting of trade data by the traders themselves with little management oversight, orchestrated manipulation of reported prices, and efforts to evade quality-control processes at the trade indices. Id. "[B]ecause many gas and electric jurisdictional transactions are based on the published indices," FERC "needs to be sure that the indices are accurate and not subject to manipulation." Id. ¶ 61,286.

FERC's investigation uncovered a "system-wide lack of reporting conventions and internal controls to ensure accuracy of reported data." Id. ¶ 61,287. As FERC has left rate-setting to the forces of a free and competitive market rather than through direct rate-setting measures, market manipulation subverts FERC's regulatory goals by undermining the "accuracy and integrity" of the market. Id. FERC therefore required certain natural gas companies, including some of the Defendants in these MDL proceedings, to make certain showings with respect to their price reporting practices. Id.

FERC also sought to address these abuses by "providing some degree of regulatory certainty to industry participants that would encourage them voluntarily to report energy transactions to the providers of price indices." Policy Statement on Natural Gas & Electric Price Indices, 104 F.E.R.C. ¶ 61,121, ¶ 61,403 (July 24, 2003). Among the actions

FERC took was to develop "minimum standards" for jurisdictional entities providing data to the price indices, including that data providers adopt a code of conduct for employees; separate price reporting from trading within the company; report certain details of transactions, including price, volume, and delivery or receipt location; provide an error resolution process, and retain data for three years.  Id. ¶ 61,408.  Companies following these minimum standards would be entitled to a rebuttable presumption that they made their price reports in good faith, and FERC will not investigate or penalize them for inadvertent price-reporting mistakes.  Id. at ¶ 61,404.  However, FERC cautioned that "instances of intentional submission of false, incomplete or misleading information to index developers" would be subject to prosecution.  Id. ¶ 61,409.

FERC thereafter amended the blanket certificates by adopting a code of conduct for jurisdictional sellers.  Amendments to Blanket Sales Certificate, 105 F.E.R.C. ¶ 61,217 (Nov. 17, 2003).  The code of conduct required that any jurisdictional entities reporting transactions to private price index publishers "shall provide complete and accurate information to any such publisher."  Id. at ¶ 5.  FERC indicated its code of conduct was "designed to prohibit market-based rate sellers from taking actions without a legitimate business purpose that are intended to or foreseeably could interfere with the prices that would be set by competitive forces," including wash trades.  Id. at ¶ 38.  FERC also reiterated its position that it would not require price reporting to the private indices, but "the practices set forth in our Policy Statement represent the necessary minimum for those entities that choose to report."  Id. ¶ 73.

The code of conduct prohibited jurisdictional entities from "engaging in actions that are without a legitimate business purpose and that are intended to or foreseeably could manipulate market rules, prices, or conditions," including false price reports, wash trades, and collusion.  Order Denying Rehearing of Blanket Sales Certificates Order, 107 F.E.R.C. ¶ 61,174, ¶ 61,688 (May 19, 2004).  FERC implemented these regulations pursuant to its

authority under sections 5,[18] 7, and 16 of the NGA.  Id. ¶ 61,690.  FERC did not find any particular jurisdictional seller engaged in these practices.  Id.  Rather, it found "the prohibited practices are unjust and unreasonable, and . . . their explicit prohibition is necessary to ensure that market-based sales of gas will be adequately protected from manipulation and, therefore, will be just and reasonable."  Id.  Moreover, FERC rejected a suggestion that "actions that do not adversely affect prices to a degree that makes them unjust and unreasonable are not covered by the rule" because such a suggestion "fundamentally misunderstands that market-based rates can be presumed just and reasonable only if a marketplace is competitive.  Any action or transaction in violation of these regulations puts into question the competitiveness of the market in which the violation occurs."  Id. ¶ 61,696.

In sum, FERC initiated a proceeding pursuant to its authority under the NGA to determine whether practices related to false price reporting to indices, wash trades, and collusion were just and reasonable practices.  FERC determined those practices were unjust and unreasonable, and set the new practices in the Policy Statement setting forth minimum standard reporting practices, and in the code of conduct prohibiting manipulative conduct such as false price reporting, wash trades, and collusion.

Claims aimed at Defendants' alleged practices of false price reporting, wash trades, and anti-competitive collusive behavior therefore are preempted, regardless of whether Defendants actually engaged in such conduct.  No genuine issue of material fact remains that such practices directly affect the jurisdictional rate because, as FERC concluded, any such manipulative conduct would undermine confidence in, and the operation of, a competitive and transparent market for jurisdictional sales where

///

---

[18] Section 5 of the NGA is § 717d.  Natural Gas Act, c. 556, § 52 Stat. 821 (June 21, 1938).

jurisdictional rates are set by reference to the indices.[19]

That FERC has such jurisdiction is demonstrated not only by FERC's actual exercise thereof in relation to these practices, but by the fact that the Court would have little trouble rejecting a challenge to FERC's jurisdiction to prohibit jurisdictional sellers from engaging in false price reporting, wash trades, and other collusive or manipulative conduct that affected the price mechanism by which jurisdictional rates are set.  Unlike corporate governance or employment decisions, manipulation of the indices is not insignificant or tangential to jurisdictional rates.  Although the indices are not themselves jurisdictional rates, they are the method by which jurisdictional rates are set and embody jurisdictional rates.[20]  Thus, manipulation of the indices directly affects jurisdictional rates.  See Am. Gas Ass'n, 912 F.2d 1506 (agreeing with FERC's interpretation of "contract affecting such rate" to mean "providing for the rate in whole or in part, or specifying or embodying it, or setting forth rules by which it is to be calculated").

///

---

[19]  Plaintiffs do not seriously dispute that jurisdictional rates are set by reference to the indices, except to argue that the scope of FERC's jurisdiction is a legal conclusion rather than a question of fact.  FERC has found, after a fact-finding investigation, that jurisdictional rates were set at index during the relevant time period.  Order Directing Submission of Information With Respect to Internal Processes for Reporting Trading Data, 103 F.E.R.C. ¶ 61,089, ¶ 61,286 (Apr. 30, 2003).  Defendants have provided evidence that jurisdictional contracts included price terms set at index.  (Defs.' Joint Appx. in Support of Renewed Mot. & Mot. for Summ. J. Based on Fed. Preemption (Doc. #1882), Exs. 37, 38, 44, 49, 50.); see also Gallo, 503 F.3d at 1031-32 ("Thus, despite their wide use as reference points in pricing natural gas sales and derivatives, including most of the transactions subject to FERC's jurisdictional authority, the information used to calculate the indices was reported in a less than meticulous manner.").  Plaintiffs present no evidence raising an issue of fact that jurisdictional rates were not set at index.  Plaintiffs have presented no substantive legal argument as to why Defendants' evidence does not reasonably support only one legal conclusion: that jurisdictional rates were set at index.

[20]  Plaintiff's expert averred that "it can be said that the prices that were the subject of the manipulation are the prices of natural gas in this country."  (Defs.' Jt. Appx. in Support of Renewed Mot. & Mot. for Summ. J. Based on Fed. Preemption (Doc. #1882), Ex. 35 at ¶ 18 (emphasis in original).)

1    Even if a factual determination was required regarding whether Defendants

2 actually engaged in such practices, and such activity actually impacted a jurisdictional rate,

3 Defendants would be entitled to summary judgment.  The Court is confronted with the

4 rather odd situation in which Defendants seek to use Plaintiffs' allegations in the various

5 Complaints regarding Defendants' conduct to prove no genuine issue of material fact exists

6 while at the same time positing that issues of fact remain on that very issue because

7 Defendants deny they engaged in such conduct.  Plaintiffs, meanwhile, contend Defendants

8 cannot use Plaintiffs' allegations as admissions to support Defendants' summary judgment

9 motion, even though those allegations are necessary for Plaintiffs to prevail on the merits.

10 Plaintiffs contend Defendants cannot conditionally concede Plaintiffs' allegations are true

11 only for purposes of the summary judgment motions; rather they must be bound by any such

12 concession for all purposes.

13    Plaintiffs rely on <u>Lloyd v. Franklin Life Insurance Co.</u> for the proposition that a

14 party may not make a conditional concession of fact at the summary judgment stage.  245

15 F.2d 896, 897 (9th Cir. 1957).  <u>Lloyd</u> stated the following:

> We hold such a condition invalid. A concession of fact on motion for summary judgment establishes the fact for all time between the parties. The party cannot gamble on such a conditional admission and take advantage thereof when judgment has gone against him. This Court will not emasculate thus the efficient devices of summary judgment. Nor will we follow the weary road of common law pleading through tortuous sinuosities whereby facts admitted by a demurrer to any pleading must be established by proof in order to have judgment. This is not to say that there could be no relief by the court from an erroneous admission of a party. But there cannot be a tentative or conditional admission on motion for summary judgment, which by definition posits that there are not in truth any unresolved issues of material fact which must be tried if the wheel turns wrong. Of this all practitioners should take notice. The facts should be established first, and the law can only be laid down in light thereof.

24 <u>Id.</u>  This statement was dicta, however, as the <u>Lloyd</u> Court's decision did not turn on the

25 concession.  <u>Id.</u> at 897-900.  Other decisions in the Ninth Circuit indicate that a party

26 generally is bound by its statements in its own pleadings.  <u>See</u> <u>Cortez-Pineda v. Holder</u>, 610

F.3d 1118, 1123 (9th Cir. 2010); <u>Sicor Ltd. v. Cetus Corp.</u>, 51 F.3d 848, 859-60 (9th Cir. 1995) ("[A] statement in a complaint may serve as a judicial admission."); <u>Am. Title Ins. Co. v. Lacelaw Corp.</u> 861 F.2d 224, 226 (9th Cir. 1988) ("Factual assertions in pleadings and pretrial orders, unless amended, are considered judicial admissions conclusively binding on the party who made them.").

To the extent <u>Lloyd</u> accurately states the law, application of <u>Lloyd</u> in this instance would lead to an absurd result. If Plaintiffs subsequently prevail in showing that Defendants engaged in manipulative conduct that affected the price indices as Plaintiffs allege, Plaintiffs' victory on their state law claims would be short-lived. Upon such a showing, the case for preemption would be complete. Plaintiffs would successfully show Defendants engaged in manipulative practices that affected the indices, and thereby affected jurisdictional rates set by reference to the very same indices.[21] To allow the state law claims to proceed under these circumstances would be a waste of the parties' and the federal judicial system's limited resources.

Plaintiffs' theory of the case is that Defendants collusively manipulated the price indices. Plaintiffs cannot prevail without making that showing. However, upon making that showing, Plaintiffs will have established their state law claims are preempted. Plaintiffs' state law claims therefore are doomed, either because Plaintiffs will be unable to prevail on the merits, or, if they do, they will succeed in proving their claims are preempted. To allow such claims to proceed serves no purpose. Consequently, to the extent a factual showing that Defendants actually engaged in such conduct is necessary, the Court

---

[21] Plaintiffs' expert has averred that "if a Defendant has manipulated price indices, everyone who purchases gas based on that price index will be harmed. . . . Indeed, all purchasers who bought at that price index will be harmed because they have purchased at a price that does not reflect the competitive dynamics of the market. Rather, they pay a price that reflects the actions of entities whose goal is to prevent full and free competition and who seek to control the prices paid for natural gas." (Defs.' Joint Appx. in Support of Renewed Mot. & Mot. for Summ. J. Based on Fed. Preemption (Doc. #1882), Ex. 35 at ¶ 49.)

concludes Defendants may conditionally admit that they engaged in the alleged misconduct to demonstrate that, taking Plaintiffs' allegations as true, Defendants are entitled to judgment as a matter of law.

### D.  Kansas Gas Marketing Company

Defendant Kansas Gas Marketing Company ("KGMC") attaches to Defendants' Joint Appendix in Support of Renewed Motion and Motion for Summary Judgment Based on Federal Preemption an affidavit to the effect that it did not submit any data about natural gas prices to the indices, and that it did not engage in wash trades or churning as alleged in the Amended Complaints in Heartland and Learjet.  (Jt. Appx., Ex. 48.)  To the extent KGMC is seeking summary judgment on the merits, the Court will deny it.  KGMC is not mentioned in the motion for summary judgment, and no argument is made in that motion that KGMC is entitled to summary judgment on the merits.  KGMC makes no argument the claims against it are preempted and provides no evidence in support of such a proposition, which was the basis of the joint motion for summary judgment.

## IV.     CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Joint Renewed Motion and Motion for Summary Judgment (Doc. #1880) is hereby GRANTED in part and DENIED in part as follows:

• In Learjet, et al. v. ONEOK, Inc., et al., 2:06-CV-00233-PMP-PAL, all of Plaintiff's claims in the Second Amended Complaint (Doc. #1857) are hereby dismissed as preempted against the following Defendants:

- ONEOK, Inc.

- ONEOK Energy Marketing & Trading Co., L.P.

- The Williams Companies, Inc.

- Williams Merchant Services Company, Inc.

- Williams Energy Marketing & Trading

1    - American Electric Power Company

2    - AEP Energy Services, Inc.

3    - Duke Energy Corporation

4    - Duke Energy Trading and Marketing Company, L.L.C.

5    - Dynegy Marketing & Trade

6    - El Paso Corporation

7    - El Paso Merchant Energy, L.P.

8    - CMS Energy Corporation

9    - CMS Marketing Services & Trading Company

10   - CMS Field Services

11   - Reliant Energy, Inc.

12   - Reliant Energy Services, Inc.

13   - Coral Energy Resources, L.P.

14   - Xcel Energy, Inc.

15   - ePrime, Inc.

16   • In Heartland Regional Medical Center, et al. v. ONEOK, Inc., et al., 2:07-CV-

17   00987-PMP-PAL, all of Plaintiff's claims in the Amended Complaint (Doc. #1863) are

18   hereby dismissed as preempted against the following Defendants:

19   - ONEOK, Inc.

20   - ONEOK Energy Marketing & Trading Co., L.P.

21   - The Williams Companies, Inc.

22   - Williams Merchant Services Company, Inc.

23   - Williams Energy Marketing & Trading

24   - American Electric Power Company

25   - AEP Energy Services, Inc.

26   - Duke Energy Corporation

1        - Duke Energy Trading and Marketing Company, L.L.C.

2        - Dynegy Marketing & Trade

3        - El Paso Corporation

4        - El Paso Merchant Energy, L.P.

5        - CMS Energy Corporation

6        - CMS Marketing Services & Trading Company

7        - CMS Field Services

8        - Reliant Energy, Inc.

9        - Reliant Energy Services, Inc.

10        - Coral Energy Resources, L.P.

11        - Xcel Energy, Inc.

12        - ePrime, Inc.

13        • In <u>Breckenridge Brewery of Colorado, LLC, et al. v. ONEOK, Inc., et al.,</u> all of

14    Plaintiff's claims in the Amended Complaint (Doc. #717, Ex. A) are hereby dismissed as

15    preempted against the following Defendants:

16        - Xcel Energy, Inc.

17        - ePrime Energy Marketing, Inc.

18        • In <u>Reorganized FLI, Inc. v. Williams Companies Inc., et al.,</u> 2:05-CV-01331-

19    PMP-PAL, all of Plaintiff's claims in the Amended Complaint (Doc. #11 in 2:05-CV-

20    01331-PMP-PAL) are hereby dismissed as preempted against the following Defendants:

21        - ONEOK, Inc.

22        - ONEOK Energy Marketing & Trading Co., L.P.

23        - The Williams Companies, Inc.

24        - Williams Merchant Services Company, Inc.

25        - Williams Energy Marketing & Trading

26        - American Electric Power Company

1        - AEP Energy Services, Inc.

2        - Duke Energy Corporation

3        - Duke Energy Trading and Marketing Company, L.L.C.

4        - Dynegy Marketing & Trade

5        - El Paso Corporation

6        - El Paso Merchant Energy, L.P.

7        - CMS Energy Corporation

8        - CMS Marketing Services & Trading Company

9        - CMS Field Services

10       - Reliant Energy, Inc.

11       - Reliant Energy Services, Inc.

12       - Coral Energy Resources, L.P.

13       - Xcel Energy, Inc.

14       - ePrime, Inc.

15    • In Arandell Corp., et al. v. Xcel Energy, Inc., et al., 2:07-CV-01019-PMP-PAL,

16  all of Plaintiff's claims in the Amended Complaint (Doc. #11 in

17  2:05-CV-01331-PMP-PAL) are hereby dismissed as preempted against the following

18  Defendants:

19       - Xcel Energy, Inc.

20       - Northern States Power Company

21       - American Electric Power Company

22       - CMS Field Services

23       - CMS Energy Corporation

24       - CMS Marketing Services & Trading Company

25       - Coral Energy Resources, L.P.

26       - Duke Energy Carolinas, LLC

1                    - Duke Energy Trading and Marketing Company, L.L.C.

2                    - Dynegy Illinois Inc.

3                    - DMT G.P. L.L.C.

4                    - Dynegy GP Inc.

5                    - Dynegy Marketing and Trade

6                    - ePrime, Inc.

7                    - El Paso Corporation

8                    - El Paso Merchant Energy, L.P.

9                    - ONEOK, Inc.

10                 - ONEOK Energy Marketing & Trading Co., L.P.

11                 - Reliant Energy, Inc.

12                 - Reliant Energy Services, Inc.

13                 - The Williams Companies, Inc.

14                 - Williams Power Company, Inc. (Williams Energy Marketing & Trading)

15                 - Williams Merchant Services Company, Inc.

16       • In Arandell Corp., et al. v. CMS Energy Corp., et al.,

17 2:09-CV-01103-PMP-PAL, all of Plaintiff's claims in the Amended Complaint (Doc. #10-2

18 in 2:09-CV-01103-PMP-PAL) are hereby dismissed as preempted against the following

19 Defendants:

20                 - CMS Energy Corporation

21                 - CMS Marketing Services & Trading Company

22                 - CMS Field Services

23       • In NewPage Wisconsin System, Inc. v. CMS Energy Resource Management

24 Co., et al., 2:09-CV-00915-PMP-PAL, all of Plaintiff's claims in the Amended Complaint

25 (Doc. #1952) are hereby dismissed as preempted against the following Defendants:

26                 - CMS Marketing Services & Trading Company

1        - CMS Energy Corporation

2        - CMS Field Services

3        - Xcel Energy, Inc.

4        - Northern States Power Company

5        - Coral Energy Resources, L.P.

6        - Duke Energy Trading and Marketing Company, L.L.C.

7        - Dynegy Illinois Inc.

8        - DMT G.P. L.L.C.

9        - Dynegy GP Inc.

10        - Dynegy Marketing and Trade

11        - ePrime, Inc.

12        - El Paso Corporation

13        - El Paso Marketing, L.P.

14        - ONEOK, Inc.

15        - ONEOK Energy Marketing & Trading Co., L.P.

16        - Reliant Energy Services, Inc.

17        - The Williams Companies, Inc.

18        - Williams Power Company, Inc. (Williams Energy Marketing & Trading)

19        - Williams Merchant Services Company, Inc.

20        • The motion is DENIED as to the remaining Defendant in <u>Learjet, et al. v.</u>

21 <u>ONEOK, Inc., et al.</u>, and <u>Heartland Regional Medical Center, et al. v. ONEOK, Inc., et al.</u>,

22 2:07-CV-00987-PMP-PAL, Defendant Kansas Gas Marketing Company.

23        **IT IS FURTHER ORDERED** that the ePrime Defendants' Notice of Motion

24 and Motion for Partial Summary Judgment Based on Preemption (Doc. #1884) is hereby

25 GRANTED as follows:

26        • In <u>Sinclair Oil Corporation v. e-Prime, Inc. and Xcel Energy Inc.</u>,

2:06-CV-00267-PMP-PAL, counts 3 through 11 of Plaintiff's Complaint (Doc. #1 in 2:06-CV-00267-PMP-PAL) are hereby dismissed as preempted against the following Defendants:

        - Xcel Energy, Inc.

        - ePrime, Inc.

**IT IS FURTHER ORDERED** that Dynegy Inc. and Dynegy Marketing and Trade's Motion for Partial Summary Judgment (Doc. #1891) is hereby GRANTED as follows:

    • In <u>Multiut Corporation v. Dynegy, Inc., et al.</u>, 2:05-CV-01300-PMP-PAL, counts 2 and 3 of Plaintiff's Complaint (Doc. #1 in 2:05-CV-01300-PMP-PAL) are hereby dismissed as preempted against the following Defendants:

        - Dynegy, Inc.

        - Dynegy Marketing and Trade

**IT IS FURTHER ORDERED** that ONEOK Energy Services Company's Motion for Partial Summary Judgment (Doc. #1944) is hereby GRANTED as follows:

    • In <u>Sinclair Oil Corporation v. OneOK Energy Services Company, L.P.</u>, 2:06-CV-00282-PMP-PAL, counts 1-6, 8, and 10 of Plaintiff's claims in the Complaint (Doc. #1 in 2:06-CV-00282-PMP-PAL) are hereby dismissed as preempted against the following Defendants:

        - ONEOK Energy Services Company, L.P.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion for Class Certification (Doc. #1383) and Plaintiffs' Motion for Class Certification (Doc. #1394) are hereby DENIED as moot.

**IT IS FURTHER ORDERED** that to the extent this Order results in judgment against fewer than all Defendants and/or judgment on fewer than all claims in any of the above actions, the Court directs final judgment be entered on the above-identified claims

for the above-identified Defendants, as no just reason for delay exists.

**IT IS FURTHER ORDERED** that the stay imposed by the Order Re: Stay of Certain Proceedings (Doc. #1942) is hereby lifted.

**IT IS FURTHER ORDERED** that the parties shall file any supplemental briefs regarding the various remaining pending motions for class certification on or before August 18, 2011.

DATED: July 18, 2011

PHILIP M. PRO
United States District Judge

47